```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
                        HOUSTON DIVISION


FLORENCE K. BUTLER,              §
                                 §
     Plaintiff,                  §
                                 §
v.                               §   CIVIL ACTION NO. H-13-1030
                                 §
TEXAS HEALTH AND HUMAN SERVICES  §
COMMISSION,                      §
                                 §
     Defendant.                  §
```

MEMORANDUM & ORDER

Pending is Defendant Texas Health and Human Services Commission's Motion for Summary Judgment (Document No. 42). After considering the motion, responses, reply, and applicable law, the Court concludes as follows.

I. Background

In February 2008, *pro se* Plaintiff Florence K. Butler ("Plaintiff"), a black Methodist woman, began working for Defendant Texas Health and Human Services Commission ("Defendant") as a Texas Works Advisor ("TWA"), enrolling clients in the Medicaid program.[1] Beginning in September 2009, Plaintiff was supervised by Bonnie Abraham, a black woman.[2] Abraham avers that she quickly noticed

---

[1] Document No. 42, ex. A at Appx. 2, Appx. 7.

[2] Id., ex. B ¶¶ 2, 4.

problems with Plaintiff's performance.[3] On October 14, 2009, Abraham met with Plaintiff to discuss her performance problems.[4] Abraham explained to Plaintiff that Plaintiff was only completing 15 to 17 cases per day and that she had accumulated a large backlog of unprocessed cases.[5] Abraham informed Plaintiff that based on her tenure, she should be processing more than 25 to 30 cases per day.[6] Abraham agreed to redistribute 50 of Plaintiff's cases to other employees, but told Plaintiff that she would be responsible for keeping up with her workload in the future.[7] Abraham met with Plaintiff to discuss her performance for a second time on October 27, 2009.[8] Abraham told Plaintiff that she would once again redistribute some of Plaintiff's cases to help clear her backlog, but informed Plaintiff that continued poor performance would be grounds for corrective action.[9] On December 29, 2009, Abraham met with Plaintiff for a third time and told her that she was still not

---

[3] Id., ex. B ¶ 4.

[4] Id., ex. B ¶ 4; id., ex. B-1 (October 14, 2009 "Conference Notes for Employee File" memo prepared by Bonnie Abraham).

[5] Id., ex. B ¶ 4; id., ex. B-1.

[6] Id., ex. B ¶ 4; id., ex. B-1.

[7] Id., ex. B ¶ 4; id., ex. B-1.

[8] Id., ex. B ¶ 5.

[9] Id., ex. B ¶ 5. See also id., ex. B-2 (October 27, 2009 "Coaching for Employee File" memo prepared by Bonnie Abraham).

completing the expected 25 to 30 cases per day.[10] Abraham informed Plaintiff that Abraham would be recommending corrective action.[11]

On March 17, 2010, Abraham issued a written notice placing Plaintiff on First-Level Corrective Action based on her failure to meet performance expectations.[12] At this point, Plaintiff was expected to complete 40 cases per day, but was averaging only 15-17 cases,[13] and several hundred of her cases had been redistributed to other staff since October 2009.[14] The notice advised Plaintiff that she would remain on First Level Corrective Action for three months and, if she was unable to complete her assigned cases for three consecutive months without redistribution, "more serious corrective action is possible, up to and including dismissal."[15]

---

[10] Id., ex. B ¶ 6; id., ex. B-3.

[11] Id., ex. B-3.

[12] Id., ex. B ¶ 7; id., ex. B-4. First-Level Reminders are the first level of the formal corrective action process and are issued to "correct[] a minor offense, usually when the employee does not improve performance after coaching or counseling." Id., ex. B-5 at Appx. 35, Appx. 40.

[13] Id., ex. B ¶ 8; id., ex. B-4 at Appx. 32.

[14] See id., ex. B-4 at Appx. 33 ("One hundred (100) of your assigned cases were redistributed to other staff to complete in October 2009, forty (40) cases were redistributed in November 2009 and another 281 of your assigned cases were redistributed in December 2009. In January 2010, 280 cases were redistributed and in February 2010, 105 cases were redistributed in to other workers for completion.").

[15] Id., ex. B-4 at Appx. 33.

On April 30, 2010, Abraham once again met with Plaintiff regarding her poor performance.[16] Abraham informed Plaintiff that her performance had not improved, and that Abraham would be recommending the next level of corrective action.[17] On June 8, 2010, Abraham issued written notice placing Plaintiff on Second-Level Corrective Action.[18] The written notice informed Plaintiff that she was required to complete 30 or more cases per day, but had averaged fewer than 19 cases per day in March and April 2010,[19] and that several hundred more of her cases had been redistributed to other staff in March, April, and May of 2010.[20] Plaintiff would remain on the Second Level Corrective Action for six months, and could be subject to "more serious corrective action . . . up to and including dismissal" if she did not complete her assigned cases without redistribution during that time.[21]

---

[16] Id., ex. B ¶ 9.

[17] Id., ex. B ¶ 9.

[18] Id., ex. B ¶ 10; id., ex. B-7. Second-Level Reminders are "to correct a serious performance problem." Id., ex. B-5 at Appx. 41.

[19] Id., ex. B-7 at Appx. 56 (Plaintiff averaged 17.73 cases per day in March 2010 and 18.27 cases per day in April 2010).

[20] Id., ex. B-7 at Appx. 56 ("Two hundred fifty nine (259) of your assigned cases were redistributed to other staff to complete in March 2010, one hundred fifty eight (192) [sic] cases were redistributed in April 2010 and currently, one hundred ninety four (194) cases were redistributed in May 2010.").

[21] Id., ex. B-7 at Appx. 56.

On September 9, 2010, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), complaining of "ongoing harassment" and a hostile work environment.[22] On September 14, 2010, Plaintiff requested a transfer to an alternate location closer to her home.[23] Plaintiff cited the "hostile work environment, personality conflicts amongst co-workers and supervisory biases" at her present location, along with her long commute, as reasons she wanted to transfer.[24] Defendant's evidence is that Plaintiff's transfer request was denied because she was on Second Level Corrective Action at the time of her transfer request.[25]

On September 17, 2010, Abraham placed Plaintiff on Third-Level Corrective Action due to her "constant behavioral issues" and "inappropriate outbursts at the office."[26] The written notice provided to Plaintiff detailed several instances in June and July of 2010 in which Plaintiff yelled at Abraham and refused to follow

---

[22] Document No. 44-1 at 27 of 30.

[23] Document No. 47, ex. Q.

[24] Document No. 42, ex. B-10.

[25] Id., ex. B ¶ 13; id., ex. D ¶ 4.

[26] Id., ex. B ¶ 11. A Third-Level Corrective Action is "the final and most serious level of the formal corrective action process" and "provides the employee with one last opportunity to correct the performance problem." Id., ex. B-5 at Appx. 44.

her instructions.[27] The notice stated that the Third-Level Corrective Action would last for twelve calendar months, and if Plaintiff repeated the listed violations, or remained unable to complete her assigned cases without redistribution, "more serious disciplinary action is possible, up to and including dismissal."[28]

On September 16, 2011, Supervisor Charlotte Smith, a black woman, sent to Plaintiff a memorandum notifying her that her Third-Level Corrective action was inactivated, and "commended" her for her "efforts in correcting the problem."[29] On October 17, 2011, Plaintiff once again requested to transfer to a location closer to her home, citing "numerous stress factors and a hostile work environment" and a desire to be closer to her daughter and ill mother.[30] Plaintiff was placed on the regional transfer list, and remained there until the time of her termination.[31]

From October 2011 until her termination in May 2012, Plaintiff worked in the Children's Medicaid Center under the supervision of Smith.[32] In addition to Plaintiff, Smith supervised twelve to fifteen other TWAs, all of whom were required to process 30 cases

---

[27] Id., ex. B-8.

[28] Id., ex. B-8 at Appx. 61.

[29] Document No. 47, ex. X; Document No. 42, ex. C ¶ 2.

[30] Document No. 42, ex. C-6.

[31] Id., ex. D ¶ 5; id., ex. D-1.

[32] Id., ex. C ¶ 2.

per day.[33] Smith avers that Plaintiff was the lowest producer in the unit, routinely processing fewer than 15 cases per day, and that Smith had to reassign her cases to other employees.[34] Smith held several coaching sessions with Plaintiff to help her improve her performance, but Plaintiff continued to fail to meet performance standards.[35] Smith also asserts that Plaintiff "displayed disruptive, disrespectful, and insubordinate behavior in the office in violation of agency rules," and that her behavior was the worst in the unit.[36]

On May 4, 2012, Smith issued Plaintiff a Notice of Possible Disciplinary Action.[37] The Notice stated that Plaintiff had "displayed very disrespectful and insubordinate behavior" toward Smith, failed to follow instructions, and processed fewer than 15 cases per day.[38] The Notice informed Plaintiff that she could be subject to "suspension, demotion, or discharge for cause," and invited her to provide any information she believed was "a defense

---

[33] Id., ex. C ¶¶ 3-4.

[34] Id., ex. C ¶ 4.

[35] Id., ex. C ¶ 5.

[36] Id., ex. C ¶ 6.

[37] Id., ex. C ¶ 9; id., ex. C-4. Smith explains that "[b]ecause Plaintiff had already been placed on a Third-Level Reminder, I could not place her on another Third-Level Reminder." Id., ex. C ¶ 9.

[38] Id., ex. C-4.

or which might mitigate the circumstances."[39] Plaintiff was placed on emergency leave at this time.[40] On May 15, 2012, Plaintiff was terminated.[41]

Plaintiff alleges that the denial of her transfer requests and her termination were motivated by racial and religious discrimination, in violation of Title VII.[42] Remaining for adjudication are Plaintiff's claims for disparate treatment, discriminatory discharge, and her claim that she was retaliated against for filing her 2010 Charge with the EEOC.[43] Defendant moves for summary judgment.[44]

---

[39] Id., ex. C-4 at Appx. 76, Appx. 78.

[40] Id., ex. C-4 at Appx. 78.

[41] Id., ex. C-7.

[42] Document No. 1 (Compl.).

[43] See id. By Order signed October 21, 2013, Plaintiff's Age Discrimination in Employment Act claim was dismissed as barred by the Eleventh Amendment. Document No. 19 at 5-6. That Order should have recited the dismissal was without prejudice for lack of jurisdiction, and is hereby corrected sua sponte. FED. R. CIV. P. 60(a). In the same October 21, 2013 Order, the Court also dismissed with prejudice Plaintiff's claim that she was retaliated against for filing a workers' compensation claim. The Court conditionally dismissed with prejudice Plaintiff's hostile work environment claim, which dismissal was effective when Plaintiff failed to amend her Complaint within the 21 days allowed to replead.

[44] Document No. 42.

## II. Legal Standard

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. Id. "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Id. 56(c)(3).

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct.

2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id. Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." Anderson, 106 S. Ct. at 2513.

### III. Analysis

A. Title VII Standard

Title VII proscribes an employer from hiring, discharging, or otherwise discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment" because of that individual's race. 42 U.S.C. § 2000e-2(a)(1). The Title VII inquiry is "whether the defendant intentionally discriminated against the plaintiff." Roberson v. Alltel Info. Servs., 373 F.3d 647, 651 (5th Cir. 2004). Intentional discrimination can be established through either direct or

10

circumstantial evidence. Wallace v. Methodist Hosp. Sys., 271 F.3d 212, 219 (5th Cir. 2001). If no direct evidence is presented, the claims must be analyzed using the framework set forth in McDonnell Douglas Corp. v. Green, 93 S. Ct. 1817 (1973). Bryan v. McKinsey & Co., Inc., 375 F.3d 358, 360 (5th Cir. 2004).

Under this framework, a plaintiff must first create a presumption of intentional discrimination by establishing, by a preponderance of the evidence, a *prima facie* case of discrimination. See Wallace, 271 F.3d at 219. Once the plaintiff establishes a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. Id. If the employer sustains its burden, the *prima facie* case is dissolved, and the burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) the employer's reason, while true, is not the only reason for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive alternative). Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc., 482 F.3d 408, 411-12 (5th Cir. 2007).

B.  Discriminatory discharge and disparate treatment claims

Plaintiff has produced no direct evidence of discrimination, so the Court applies the McDonnell Douglas framework. See Wallace,

11

271 F.3d at 219. Plaintiff must first establish a *prima facie* case of discrimination by demonstrating that she: "(1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment . . . that other similarly situated employees were treated more favorably." Bryan, 375 F.3d at 360. The Fifth Circuit defines "similarly situated" very narrowly to mean "employees who are treated more favorably under nearly identical circumstances." Beltran v. Univ. of Tex. Health Sci. Ctr. at Houston, 837 F. Supp. 2d 635, 642 (S.D. Tex. 2011) (Miller, J.) (internal quotations omitted). The "nearly identical" standard is a stringent one, and excludes employees with "different responsibilities, different supervisors, different capabilities, different work rule violations or different disciplinary records." Id.

Plaintiff has not demonstrated a *prima facie* case of discriminatory discharge because she has not presented evidence that she was replaced by someone outside her protected class. Plaintiff has also not demonstrated a *prima facie* case of disparate treatment, as she has not identified any similarly situated comparator outside her protected class that was treated more favorably. Plaintiff alleges that Defendant "allowed other coworkers of a different race to transfer out," but does not

12

present evidence that those coworkers were similarly situated to Plaintiff.[45] Furthermore, the summary judgment evidence is that from September 2010 to June 2012, fourteen Children's Medicaid staff members in addition to Plaintiff requested transfers, and twelve were approved.[46] Of those twelve, eight were black, two were Hispanic, one was Asian, and one was white.[47] Accordingly,

---

[45] See Document No. 42, ex. A at Appx. 12-13 ("Q. . . . What evidence do you have that [Defendant] discriminated against you on the basis of your race? A. They -- they allowed other coworkers of a different race to transfer out. . . . [T]hey allowed different white employees to get transferred out, younger employees to get transferred out, but didn't allow me to get transferred out. . . . They allowed Jennifer Rainey, which is a white female, to be transferred out."). Plaintiff exhibits her Rebuttal Statement provided to the EEOC, which lists nineteen individuals that were allowed to transfer, and includes the races, ages, and genders of some of these employees. Document No. 44-2 at 1 of 30. However, this list provides no information from which the Court can determine if these individuals were similarly situated to Plaintiff.

In her deposition, Plaintiff complained that Carol Blanchard, a white female, was demoted to a clerk position instead of being terminated. Document No. 42, ex. A at Appx. 17. However, Plaintiff presents no evidence about Ms. Blanchard's disciplinary record or her rule violations, so as to allow the Court to determine if she was similarly situated to Plaintiff. Furthermore, Plaintiff was offered a demotion in February 2011 to a Clerk position, but refused to accept it. Id., ex. C ¶ 5.

As to her claim of religious discrimination, Plaintiff admits that the only evidence she has that she was treated differently than non-Christians is that Defendant denied her requests to attend functions on Saturdays and Sundays. See id., ex. A at Appx. 17. She does not provide evidence that any similarly situated non-Methodists or non-Christians were allowed to take such leave.

[46] Document No. 42, ex. D ¶ 3

[47] Id., ex. D ¶ 3.

Plaintiff has not presented summary judgment evidence sufficient to raise a genuine issue of material fact as to the fourth element of her *prima facie* case.

Even if Plaintiff had demonstrated a *prima facie* case, her Title VII claims would fail because Defendant has articulated a legitimate, non-discriminatory reason for its actions that Plaintiff has not shown to be pretextual. The summary judgment evidence is that Plaintiff's first transfer request was denied because she was on Second-Level Corrective Action,[48] and that her second transfer request was still pending at the time of her termination.[49] As to Plaintiff's termination, Defendant's proof is that it terminated her due to repeated instances of under-performance and insubordination. Defendant has satisfied its burden of articulating a legitimate, non-discriminatory reason for Plaintiff's termination. Plaintiff disputes that her performance was deficient.[50] However, "[s]imply disputing the underlying facts of an employer's decision is not sufficient to create an issue of

---

[48] Id., ex. B ¶ 13; id., ex. D ¶ 4.

[49] Id., ex. D ¶ 5.

[50] *See, e.g.*, Document No. 44 at 7 of 30 (May 6, 2012 letter from Plaintiff stating "I have always completed 15 or more cases."); id. at 21 of 30 (March 25, 2010 email from Plaintiff about her First-Level Corrective Action: "In the memorandum letter it says that I am processing 15 to 17 cases per day. From my WHIP records it shows that I am processing 20 to 25 cases per day."); Document No. 44-1 at 18 of 30 to 25 of 30 (Disposition Timeliness Reports).

pretext." Beltran, 837 F. Supp. 2d at 644. Accordingly, Plaintiff's claims for discriminatory discharge and disparate treatment are dismissed.

C. Retaliation claim

To state a *prima facie* case of retaliation, Plaintiff must demonstrate (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) a causal link existed between the protected activity and the adverse action. Richards v. JRK Prop. Holdings, 405 F. App'x. 829, 831 (5th Cir. 2010). The filing of charges with the EEOC qualifies as a 'protected activity' under Title VII. *See* 42 U.S.C. § 2000e-3(a) (It is unlawful to discriminate against an employee because she has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII). There is no dispute that Plaintiff filed an EEOC Charge in 2010, or that she was discharged in May 2012. However, Plaintiff presents no evidence to raise a genuine issue of material fact that a causal link existed between her protected activity and her termination. Furthermore, given that more than twenty months passed between the time she filed her Charge and her termination, Plaintiff cannot rely on temporal proximity alone to establish the causal link. *See* Clark Cnty. Sch. Dist. v. Breeden, 121 S.Ct. 1508, 1511 (2001) (action taken twenty months after filing of EEOC charge "suggests,

by itself, no causality at all.") ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be very close.") (internal quotations omitted) (citing Richmond v. ONEOK, 120 F.3d 205, 209 (10th Cir. 1997) (three-month period insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four-month period insufficient)).

To the extent that Plaintiff alleges that the denial of her transfer request in September 2010 was in retaliation for filing her 2010 EEOC Charge, such claim fails. Plaintiff presents no evidence that her transfer request was not purely lateral,[51] and thus, has not demonstrated that its denial was a materially adverse employment action. See Griffin v. Citgo Petroleum Corp., 344 F. App'x 866, 868 (5th Cir. 2009) ("[A]ny purported denial of a lateral transfer did not affect Griffin's employment status, benefits, or responsibilities, meaning that it did not constitute a materially adverse employment action for a claim of retaliation."); Sabzevari v. Reliable Life Ins. Co., 264 F. App'x

---

[51] *See* Document No. 42, ex. B-10 (August 28, 2010 transfer request from Plaintiff seeking to be "relocated to an alternate location closer to my residence."). Plaintiff's second transfer request was still pending at the time of her termination, but it too appears to be a purely lateral transfer. *See* id., ex. C-6 (October 17, 2011 form requesting "LATERAL TRANSFER").

16

392, 396 (5th Cir. 2008) (denial of transfer was not a materially adverse employment action, and could not support plaintiff's retaliation claim, where plaintiff presented no evidence that the transfer was anything but lateral "in terms of pay, promotional opportunities, working conditions, and other objective factors.").

Even if Plaintiff could demonstrate a *prima facie* case of retaliation, she has not raised a genuine issue of material fact that Defendant's legitimate, non-discriminatory reasons for denying her first transfer or for terminating her were pretextual. Accordingly, Plaintiff's retaliation claim is dismissed.

### IV. Order

For the foregoing reasons, it is

ORDERED that Defendant Texas Health and Human Services Commission's Motion for Summary Judgment (Document No. 42) is GRANTED, and Plaintiff Florence Butler's claims are DISMISSED WITH PREJUDICE.

The Clerk will enter this Order, providing a correct copy to all parties of record.

SIGNED at Houston, Texas, on this 13TH day of May, 2014.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

17